[No. 23201-8-III.   Division Three.   September 27, 2005.]

TED MORRIS, *Individually and as Personal Representative,
Appellant,* v. VAAGEN BROS. LUMBER, INC., ET AL.,
*Defendants,* GLOBAL INTERNATIONAL PTE
LTD., *Respondent.*

244

*Teresa A. Sherman* (of *Paukert & Sherman, P.L.L.C.*), for appellant.

*Sharon J. Bitcon* (of *Law Offices of Sharon J. Bitcon*), for respondent.

¶1 KURTZ, J. — Global International PTE, Ltd. (Global), purchased the components of a sawmill from Vaagen Bros. Lumber, Inc. (Vaagen). The sawmill was located in Ione, Washington, and Global's intent was to ship the components to China for reassembly. Global hired E.P. Johnson Construction and Environmental, Inc. (E.P. Johnson), to disassemble and load the components for shipping. Mavis Morris, an employee of E.P. Johnson, was killed when a sawmill building collapsed while the equipment inside the

building was being disassembled. Ted Morris filed a wrongful death action on behalf of himself and the couple's adult children. The trial court granted summary judgment dismissing the claims against Global. On appeal, Mr. Morris contends there are material issues of fact as to whether: (1) Global had a duty to protect Ms. Morris as an invitee on its premises; (2) Global had a nondelegable statutory duty to provide a safe workplace and to comply with Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, regulations; and (3) Global had a common law duty to provide a safe workplace for E.P. Johnson's employees based on the theory of retained control.

¶2 We affirm the summary judgment order dismissing Mr. Morris's claims against Global.

## FACTS

¶3 In November 1995, Global purchased the components of a sawmill from Vaagen. The sawmill was located in Ione, Washington, and Global's intent was to ship the components to China for reassembly. Global retained E.P. Johnson to disassemble and load the components for shipping.

¶4 When disassembling equipment in the stacker building, employees of E.P. Johnson cut the equipment from work platforms that were attached to the walls of the building. No attempt was made to secure the walls of the stacker building during the disassembly of the equipment. On June 4, 1996, Mavis Morris was killed when the stacker building collapsed while equipment inside the building was being disassembled and removed.

¶5 This wrongful death action was filed on behalf of Ms. Morris's family and estate.

¶6 *Contract between Global and E.P. Johnson.* The Disassembly Contract (the Contract) was entered into in May 1996 between Global as the owner of the equipment to be disassembled and E.P. Johnson as the contractor. The Contract defined the scope of work as follows:

Dismantle all machinery and buildings, that are shipping overseas. Tag, pack and load into containers provided by owner. Price includes a complete manifest for all material that is to be shipped. Machinery is to be properly braced inside container so as to not shift in transit. Project is to be complete, with the site restored as per the owners agreement with Vaagen Bros., within the deadlines set out.

Clerk's Papers (CP) at 43.

¶7 Under the Contract, E.P. Johnson was responsible for supervising and directing the disassembly work. Significantly, E.P. Johnson was "solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the work." CP at 44. Moreover, E.P. Johnson was responsible for "initiating, maintaining, and supervising all safety precautions and programs" related to the disassembly work. CP at 48.

¶8 E.P. Johnson's general manager, Michael Schaub, testified E.P. Johnson was responsible for complying with all WISHA requirements.

¶9 *Involvement of David Shih.* Global planned to reassemble the sawmill equipment so that each piece held the same position it had in Ione. To achieve this goal, Global sent an employee, David Shih, from China to Ione, to oversee the packing and shipping of the sawmill components. Mr. Shih drew a layout of the equipment before disassembly and arranged for numbers to be placed on each piece of equipment to facilitate reassembly in China. The numbers assigned to each piece of equipment did not impact the order in which the equipment was disassembled.

¶10 Mr. Shih hired Ken Brooke to reassemble the equipment in China. Mr. Shih also hired Marshall Hitt to inspect the equipment in Ione so that arrangements could be made to obtain spare parts. When these men were on the Ione site, they observed how the equipment was disassembled, but they did not make suggestions as to how the disassembly should be performed.

¶11 *Disassembly and Collapse of the Stacker Building.* E.P. Johnson employees Jim Reed, Jeff Dewey, Roger Rice,

and Larry Taylor all worked to disassemble the equipment in the stacker building and all four men were present when the building collapsed, killing Ms. Morris. These men testified that they were directed by an E.P. Johnson employee.

¶12 In particular, Mr. Schaub and Mr. Shih testified that no one from Global directed how the stacker building equipment should be dismantled or removed. E.P. Johnson employees also stated that they were not told how to dismantle the stacker by any of the Asian men who walked through the jobsite.

¶13 The stacker building had elevated work platforms attached to the walls that anchored to the equipment. E.P. Johnson did not use cables to secure the walls when the equipment was removed. When the collapse of the stacker building occurred, Mr. Dewey and Mr. Reed were in the process of removing the south catwalk and Mr. Rice was cutting stairs away from the landing and the building. A big gust of wind came up just before the building collapsed.

¶14 *Citation for Code Violation.* After Ms. Morris's death, the Department of Labor and Industries issued E.P. Johnson a citation and notice of assessment report for a code violation, stating:

> Major changes were made to the Stacker building without due regard to maintaining a safety factor of 4 in that elevated work platforms that were attached to the walls and anchored to the Stacker machine were removed leading to an unplanned collapse of the structure.

CP at 85.

¶15 *Summary Judgment.* On summary judgment, the court dismissed Mr. Morris's claims based on premises liability, a statutory duty under RCW 49.17.060(2), and a common law duty based on retained control, joint venture, and outrage.

¶16 *Appeal.* On appeal, Mr. Morris contends there are material issues of fact as to whether: (1) Global had a duty to protect Ms. Morris as an invitee on its premises, (2)

Global had a nondelegable statutory duty to provide a safe workplace and to comply with WISHA regulations, and (3) Global had a common law duty to provide a safe workplace for E.P. Johnson's employees based on the theory of retained control.

## ANALYSIS

¶17 *Standard of Review.* When reviewing an order granting summary judgment, this court undertakes the same inquiry as the trial court, considering all facts and reasonable inferences in the light most favorable to the nonmoving party. *Kahn v. Salerno*, 90 Wn. App. 110, 117, 951 P.2d 321 (1998). Summary judgment is granted only where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

¶18 *Possessor Liability.* Mr. Morris contends there is a question of fact as to whether Global was the possessor of the premises and owed Ms. Morris a duty as an invitee.

¶19 Employees of an independent contractor are invitees on the premises of the landowner. *Epperly v. City of Seattle*, 65 Wn.2d 777, 786, 399 P.2d 591 (1965). Washington has adopted sections 343 and 343A of the *Restatement (Second) of Torts* to define the landowner's duty to an invitee. *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 125, 52 P.3d 472 (2002) (citing *Iwai v. State*, 129 Wn.2d 84, 93, 915 P.2d 1089 (1996)).

¶20 The *Restatement (Second) of Torts* § 343 reads as follows:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

RESTATEMENT (SECOND) OF TORTS § 343, at 215-16 (1965) (hereinafter RESTATEMENT).

¶21 Section 343A of the *Restatement* reads as follows:

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

RESTATEMENT, *supra*, at 218.

¶22 Mr. Morris's amended complaint does not state a claim against Global based on premises liability. Instead, the amended complaint states that Vaagen is the owner of the site and that Vaagen owed a duty to Ms. Morris to inspect and maintain the premises in a reasonably safe manner. Moreover, there is scant evidence to establish a question of fact as to whether Global was the possessor of the sawmill. The only evidence brought forth by Mr. Morris is the language contained in the Contract. The Contract provides that the disassembly project must be complete and the site restored, as required under the Vaagen-Global agreement, by November 9, 1996.

¶23 Even if we assume that Global was the possessor of the premises, Mr. Morris raises no question of fact to defeat summary judgment on this claim. Mr. Morris contends that Ms. Morris's death was caused by a condition on the land. But the parties appear to agree that the death was caused when the building collapsed because the equipment being dismantled helped to anchor the walls of the building. This is not a condition on the land. Also, there are no facts indicating that Global could have discovered the danger by the exercise of reasonable caution or that Global should have realized that the disassembly of the sawmill equipment involved an unreasonable risk of harm to Ms.

Morris. Likewise, there are no facts indicating that Global should have anticipated that E.P. Johnson would fail to take reasonable care when completing the disassembly process. Finally, there are no facts indicating that the danger should have been anticipated or that the danger was known and obvious.

¶24 The court properly dismissed Mr. Morris's claim based upon premises or possessor liability.

█ ¶25 *Retained Control.* Under the common law, an employer generally has no liability for injuries to an employee of an independent contractor. *Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 330, 582 P.2d 500 (1978). However, there is an exception to this rule when the employer of the independent contractor retains control over the right to direct the work. *Kamla*, 147 Wn.2d at 121. The test of control is not the amount of actual interference with the work, but the right to exercise such control. *Id.* at 119-22. When determining whether the right to control exists, a court can consider such factors as the parties' conduct and the terms of their contract. *Phillips v. Kaiser Aluminum & Chem. Corp.*, 74 Wn. App. 741, 750, 875 P.2d 1228 (1994). Retention of the right to inspect and supervise to ensure proper completion of contractual duties does not create a retained control exception to the general rule. *Kamla*, 147 Wn.2d at 120-21 (quoting *Hennig v. Crosby Group, Inc.*, 116 Wn.2d 131, 134, 802 P.2d 790 (1991)).

¶26 In *Kamla*, the employee of a subcontractor was injured when he dragged his safety line across an open elevator shaft and was dragged through the shaft when the elevator snagged the line. *Id.* at 118. Based on this record, the court concluded that summary judgment was appropriate as to the issue of retained control, because the Space Needle did not retain control over the manner in which the subcontractor performed or completed its work. *Id.* at 122.

¶27 However, in *Kinney v. Space Needle Corp.*, 121 Wn. App. 242, 85 P.3d 918 (2004), summary judgment was deemed inappropriate. The evidence presented demonstrated that the facility manager for the Space Needle

Corporation was in charge of security and safety for the employees of a subcontractor installing fireworks on the Space Needle. *Id.* at 247. The facility manager provided some of the necessary safety equipment needed to work at heights, instructed the subcontractor's employees on required safety procedures, and checked and regulated the employees' safety practices. *Id.* at 244-45. Elizabeth Kinney, an employee of the subcontractor, was injured in a fall because her safety line did not have a line stop and the rope was longer than the 28 feet that she fell. *Id.* at 246. The court concluded that there was sufficient evidence to raise a question of fact as to whether the Space Needle Corporation actively controlled and supervised all safety activities of the subcontractor's employees, especially those working on the roof. *Id.* at 247-48.

¶28 Examining the record here, there is insufficient evidence to raise a question of fact as to whether the retained control exception applies. Global did not reserve the right to involve itself in the manner in which E.P. Johnson completed the disassembly project. Likewise, Global did not actively control or supervise the safety activities of E.P. Johnson's employees.

¶29 The trial court properly dismissed Mr. Morris's claim based upon retained control.

■ ¶30 *RCW 49.17.060.* Under RCW 49.17.060(1) and (2), WISHA requires employers to (1) provide a safe work environment for its employees and (2) comply with all applicable WISHA regulations. The first section, RCW 49-.17.060(1), creates a general duty of the employer to its employees, while the second section, RCW 49.17.060(2), creates a specific duty to comply with WISHA regulations. *Stute v. P.B.M.C., Inc.,* 114 Wn.2d 454, 457, 788 P.2d 545 (1990).

¶31 *Duty under RCW 49.17.060(1).* Mr. Morris contends that Global had a duty to all employees, including Ms. Morris, to provide a safe workplace and comply with all WISHA regulations.

■ ¶32 But Ms. Morris was an employee of an independent contractor hired by Global. RCW 49.17.060(1) does not impose a general duty on an employer to provide a safe workplace to an employee of an independent contractor retained by the general contractor. *Adkins v. Aluminum Co. of Am.*, 110 Wn.2d 128, 152, 750 P.2d 1257 (1988). Hence, Global did not owe a duty to Ms. Morris under this provision.

■ ¶33 *Duty under RCW 49.17.060(2).* The liability imposed under RCW 49.17.060(2) is expansive and imposes a nondelegable specific duty on all general contractors to ensure compliance with all WISHA regulations. *Kamla*, 147 Wn.2d at 122. The nondelegable duty charged to general contractors is based on the general contractor's "innate supervisory authority" which controls the workplace. *Stute*, 114 Wn.2d at 464. In other words, this expansive liability is justified because the supervisory authority of a general contractor is per se control over the workplace. *Kamla*, 147 Wn.2d at 122 (quoting *Stute*, 114 Wn.2d at 464). However, this duty does not automatically extend to a contractor who is neither the claimant's employer nor a general contractor exercising the requisite supervisory authority. *See Shingledecker v. Roofmaster Prods. Co.*, 93 Wn. App. 867, 871-72, 971 P.2d 523 (1999).

¶34 The primary responsibility to protect the safety of all workers is placed on general contractors because they are in the best position to provide safety equipment and ensure WISHA compliance. *Kamla*, 147 Wn.2d at 124 (quoting *Stute*, 114 Wn.2d at 463). By the same token, the general contractor's nondelegable duty of ensuring WISHA compliance on the jobsite has been extended to jobsite owners who retain the right to control the manner in which a contractor and its employees complete their work. *See Kamla*, 147 Wn.2d at 123. Consequently, a jobsite owner does not have per se liability under RCW 49.17.060 but may have a duty to comply with WISHA regulations if the jobsite owner retains control over the manner in which an independent contractor completes its work. *Kamla,* 147 Wn.2d at 123-25.

¶35 Mr. Morris contends that Global served as the general contractor, or the jobsite owner, and that Global had a nondelegable statutory duty to provide a safe workplace and comply with all WISHA regulations. Mr. Morris maintains that Global retained control over the manner in which E.P. Johnson completed its work. Mr. Morris also contends that there is a question of fact as to whether the presence of Mr. Shih and Mr. Hitt at the site demonstrates retained control.

¶36 However, the record here does not contain any facts indicating that Global was the general contractor or the jobsite owner or that Global retained the requisite supervisory authority to trigger the operation of RCW 49.17.060(2).

¶37 Under the Contract, E.P. Johnson was solely responsible for the disassembly work and all safety precautions. The E.P. Johnson employees who disassembled the stacker building were directed by another E.P. Johnson employee. There is no evidence that anyone from Global instructed E.P. Johnson employees at any time during the overall disassembly of the sawmill. Mr. Shih's involvement was limited to drawing a layout of the equipment and assigning numbers to assist with reassembly in China. Mr. Hitt inspected the equipment so that spare parts could be obtained.

¶38 Mr. Morris also argues that Global's sale of safety equipment and tools to E.P. Johnson demonstrates supervisory control. He asserts some of these tools, including some chainsaws and an acetylene torch, were being used when the stacker building collapsed.

¶39 The equipment list indicates that E.P. Johnson purchased some safety equipment from Global, including earmuffs, earplugs, face shields, side shields, hooded suits, goggles, masks, gloves, and first aid kits. But this fact alone is insufficient to raise a question of material fact as to whether Global retained control over the manner in which E.P. Johnson performed its work under the contract.

¶40 Mr. Morris relies on *Stute* to support his position that the general contractor should bear primary responsibility for safety regulations.

¶41 In *Stute*, there was no evidence that P.B.M.C. contractually required the subcontractor to furnish adequate safety equipment, and there was evidence that P.B.M.C. knew that employees of the subcontractor were working on a roof without safety devices. Moreover, *Stute* placed the burden on the general contractor because the general contractor's supervisory authority puts him or her in the best position to ensure compliance. *Stute*, 114 Wn.2d at 464. Significantly, *Stute* also determined that the general contractor retained the responsibility to provide safety equipment or to contractually require subcontractors to furnish safety equipment relevant to their responsibilities. *Id.*

¶42 In contrast to *Stute*, in *Shingledecker* the court affirmed the dismissal of an action against Redmond Roofing where there was no showing that Redmond Roofing was Mr. Shingledecker's employer or that Redmond Roofing had a supervisory function or control over Mr. Shingledecker's employer, Washington Cedar, or its employees. *Shingledecker*, 93 Wn. App. at 871-72.

¶43 Global did not have a nondelegable duty to Ms. Morris under either RCW 49.17.060(1) or (2). There are no facts indicating that Global had a statutory duty as Ms. Morris's employer or as the general contractor or jobsite owner. The trial court properly dismissed the claim based upon RCW 49.17.060.

¶44 In conclusion, we affirm the summary judgment order of the trial court dismissing Mr. Morris's claims against Global.

KATO, C.J., and SWEENEY, J., concur.