240 P.3d 162 (2010)
157 Wash.App. 649
Marjorie ARNOLD, individually and as Personal Representative of the Estate of Reuben J. Arnold; and Daniel J. Arnold, individually, Appellants,
v.
SABERHAGEN HOLDINGS, INC., as successor to Tacoma Asbestos Company and The Brower Company; American Optical Corporation; The Boeing Company; Certainteed Corporation; C.H. Murphy/Clarkullman, Inc.; D & G Mechanical Insulation, Inc.; Hanson Permanente Cement, Inc., f/k/a Kaiser Cement Corporation; Kaiser Gypsum Company, Inc.; International Paper Company, individually and as successor to St. Regis Paper Company and Champion International Corp.; Kipper & Sons Fabricators, Inc.; Lockheed Shipbuilding Company; Lone Star Industries, Inc., individually and as successor-in-interest to Pioneer Sand & Gravel Company; *163 Mariana Properties, Inc., as successor-in-interest to Hooker Chemical Company; J.M. Martinac Shipbuilding Corporation; Metalclad Insulation Corporation; Millercoors, LLC, as successor-in-interest to Olympia Brewing Company; Mine Safety Appliances Company; North Safety Products USA; Occidental Chemical Corporation, as successor-in-interest to Hooker Chemical Company; P-G Industries, Inc., as successor-in-interest to Pryor Giggey Co., Inc.; Pioneer Americas, LLC, as successor-in-interest to Hooker Chemical Company; Rayonier, Inc.; Riley Power, Inc., a/k/a Riley Stoker Corp., f/k/a Babcock Borsig Power, Inc., f/k/a D.B. Riley, Inc.; Sequoia Ventures, Inc., f/k/a and as successor-in-interest to Bechtel Corporation, Bechtel, Inc., Bechtel McCone Company, Bechtel Group, Inc.; Simpson Timber Company; Todd Pacific Shipyards Corporation, individually and as successor-in-interest to Todd Pacific Shipyards Corporation; Trane U.S., Inc., f/k/a American Standard, Inc., individually and as parent and alter ego of American Boiler Corp., Westinghouse Air Brake Company and Kewanee Boiler Company, a division of American Radiator & Standard Sanitary Company; Transalta Centralia Generation, LLC; Trico Contracting, Inc.; Union Carbide Corporation; General Construction Co., as successor by merger to Wright Schuchart Harbor Co.; Weyerhaeuser Company, Zurn Industries LLC; and Goulds Pumps (IPG), Inc., Respondents.
No. 39055-8-II.
Court of Appeals of Washington, Division 2.
August 31, 2010.
*164 Brian F. Ladenburg, Matthew Phineas Bergman, Bergman Draper & Frockt, P.S., *165 Seattle, WA, Philip Albert Talmadge, Sidney Charlotte Tribe, Talmadge/Fitzpatrick, Tukwila, WA, for Appellants.
Robert Gregory André, Attorney at Law, Jeffrey Duane Dunbar, Ogden Murphy Wallace P.L.L.C., Seattle, WA, for Respondents.
Walter Eugene Barton, Attorney at Law, Seattle, WA, amicus counsel for Todd Shipyards Corporation.
PENOYAR, J.
¶ 1 Marjorie Arnold and her son Daniel (the Arnolds)[1] appeal the trial court's order granting summary judgment to Lockheed Shipbuilding Company (Lockheed) and dismissing their asbestos-related claims.[2] The Arnolds sued Lockheed after Reuben Arnold, Marjorie's husband and Daniel's father, died from mesothelioma. Together with Reuben's claims stemming from his work as an insulator at Lockheed's shipyard, the Arnolds asserted injuries from "take home exposure" i.e. exposure to asbestos that Reuben brought home on his clothing. Additionally, Daniel asserted a primary exposure claim against Lockheed based on his work as an insulator at Lockheed's shipyard. We affirm the trial court's grant of summary judgment to Lockheed with regard to Daniel's primary exposure claim but reverse with regard to the Arnolds' other claims.

FACTS

I. BACKGROUND
¶ 2 Reuben Arnold worked as an insulator for over 30 years until he retired in 1987. For about one year during 1962 and 1963, Reuben performed insulation work on Alaska ferries at Lockheed's Harbor Island shipyard in Seattle. At the time, Reuben's employer was E.J. Bartells, a Lockheed contractor. Reuben also may have worked at Lockheed in 1967-68. In 1969, Reuben performed insulation work on Navy ships at Lockheed for another contractor, either Unicor, Incorporated, or Owens Corning.[3] Reuben was a member of the insulators workers' union. Reuben was never a Lockheed employee.
¶ 3 Insulators at Lockheed's shipyard worked below deck sawing pieces of asbestos insulation and mixing insulation mud. The work created dust that coated the insulators' clothing. Reuben brought home dust on his clothes, which Marjorie shook out and laundered.
¶ 4 In 1979-80, Daniel worked at Lockheed's shipyard as an insulation assistant for an unspecified amount of time. Daniel wore a protective suit taped at the wrists and ankles, booties, two sets of gloves, and a respirator. Another worker checked to make sure he was "all covered up." Clerk's Papers (CP) at 3708. After a day's work, the insulation workers threw away all the protective gear except the respirator. Daniel worked sporadically as an insulator during the next 10 years.
¶ 5 Reuben developed mesothelioma[4] and died in April 2008. Daniel also developed mesothelioma and died recently. Dr. Samuel Hammar, a board-certified pathologist, stated that Daniel's mesothelioma was caused by "exposure to asbestos fibers brought home on the clothing and shoes of his father from June 1960-1988 while Daniel lived at his parents' home as well as his own occupational exposures to asbestos." CP at 57. In a subsequent deposition, Hammar discussed Daniel's work at Lockheed, stating, "[a]ssuming that ... [Daniel wore] protective clothing... the respirator that he wore, and he had *166 no exposure to asbestos, then that would not be a cause of his mesothelioma." CP at 3722.

II. SUMMARY JUDGMENT
¶ 6 On August 4, 2008, the Arnolds filed a complaint in Pierce County Superior Court, asserting asbestos-related claims against Lockheed and about 30 other companies.[5] The Arnolds stated that Lockheed "owed common law and statutory or regulatory duties both to [Reuben] and to his family members at home to protect them from the hazards of exposure to asbestos on the premises." CP at 148. The Arnolds sought past and future damages, including loss of consortium, medical expenses, and lost wages. Daniel also sought damages for "pain, suffering, and disability, impairment of the ability to enjoy life and a shortened life expectancy." CP at 151.
¶ 7 Lockheed, the only respondent in this appeal, is a wholly owned subsidiary of Lockheed Martin Corporation. Lockheed closed its Seattle shipyard in the late 1980s and no longer operates as a business. Lockheed's only employees are its current officers, none of whom are "directly knowledgeable about[ ] the operations of the Seattle shipyard before it closed." CP at 571.
¶ 8 The Arnolds and Lockheed engaged in discovery, exchanging interrogatories and requests for production. In December 2008, the parties also deposed several witnesses.
¶ 9 On December 26, 2008, Lockheed moved for summary judgment. On January 16, 2009, the Arnolds deposed Ildiko Songrady, Lockheed's designated Civil Rule (CR) 30(b)(6) witness. On January 27, the Arnolds filed a response to Lockheed's summary judgment motion and attached several exhibits, including the following deposition testimony.
¶ 10 John Tanner worked as a pipefitter at Lockheed during 1962-63 and 1967-69. Tanner did not know Reuben or Daniel, but he worked alongside insulators on Navy ships. When the insulators applied insulation to the pipes in the ships' engine and boiler rooms, "it was like snow in there." CP at 413.
¶ 11 According to Tanner, Lockheed's quality control personnel worked on the ships and wore white coveralls and blue hats. When workers completed their tasks in one of the ship's compartments, quality control personnel checked the work. If the workers encountered a problem, they informed their lead man, who contacted quality control personnel. A lead man supervised 7 to 15. men in a particular trade. A foreman supervised 5 to 8 lead men. A superintendent supervised the foremen and reported to Lockheed's on-board production manager.
¶ 12 Tanner stated that Lockheed personnel advised foremen about safety procedures. Tanner recalled that Lockheed employees "might tag something and say this was unsafe." CP at 416. Tanner could not recall a specific instance when Lockheed personnel tagged an unsafe area.
¶ 13 Michael Harris started working for Lockheed in 1966 as a pipefitter apprentice, and he worked his way up to a Lockheed superintendent. As a pipefitter, Harris worked alongside insulators, electricians, and painters every day in the ships' engine and boiler rooms. The conditions below deck involved "constant asbestos, fiberglass, dirt [and] dust." CP at 445. Harris washed his own work clothes, and he did not recall that contractors' employees had access to showers, lockers, or laundry facilities.
¶ 14 Harris became a Lockheed superintendent in 1973. As superintendent, he managed all the pipefitters on the ship and reported to Lockheed's production manager. The production manager was "responsible" to all crafts on the ship, including contractor craftsmen. CP at 461. As a superintendent, Harris had authority to tell contractors whose practices were unsafe to correct those practices and to instruct contractors as to proper safety practices.
¶ 15 Bruce Curtis worked alongside Reuben as an insulator for about two years, including 1968. Curtis stated that contractors *167 had to show identification to a Lockheed employee to enter the shipyard. Lockheed coordinated the different trades in the work area, including insulators, pipefitters, and shipwrights. Lockheed stored insulation materials, which it made available to the insulators, in a shack at the shipyard. Curtis stated that the insulators' union did not warn its workers about the dangers of asbestos during the 1966-69 period.
¶ 16 Ron Nickell, a general foreman for Unicor, worked with Reuben to insulate Navy ships in the summer of 1969. Nickell stated that a Lockheed supervisor provided the insulators with a release or written approval to insulate in a particular area because insulation work followed the steam fitters, pipe fitters, and sheet metal workers. Lockheed supervisors monitored "what that craft was doing and [gave] releases." CP at 643. They were "on the ship" most of the time and coordinated the work. CP at 643.
¶ 17 Tanner, Curtis, and Harris all stated that Lockheed did not inform them about the hazards of working with asbestos. Harris recalled that the asbestos fibers packed into "nice snowball[s]," which the workers threw at each other. CP at 450. Lockheed did not advise workers to wear respirators, prevent dust from settling on their clothes, or wash their coveralls on-site rather than at home. Lockheed also did not provide on-site laundry facilities, showers, disposable coveralls, or lockers to insulators.
¶ 18 Ildiko Songrady, Lockheed's corporate secretary and a paralegal at Lockheed Martin, testified as Lockheed's CR 30(b)(6) witness. She noted that Lockheed maintained approximately 13,000 boxes of records in a commercial storage center. She had only been Lockheed's corporate secretary for a "couple of months" and stated, "13,000 boxes is impossible to review in such a short time." CP at 494.
¶ 19 Songrady stated that Lockheed had contracts with the Navy in the 1960s that she "assum[ed]" exceeded $10,000. CP at 496. Lockheed learned that asbestos was hazardous before 1969, but it did not warn workers about these hazards or test for asbestos concentrations before 1980. Lockheed had a written asbestos control policy in the 1980s. Prior to 1980, Lockheed knew that changing rooms and separate clothing for asbestos workers was a recommended industrial hygiene practice, and Lockheed provided locker rooms, changing facilities, and showers.
¶ 20 During her deposition, Songrady could not answer several material questions about the relationship between Lockheed, its subcontractors, and its subcontractors' employees in the 1960s:
Q: All right. Now, was Lockheed responsible for the safety of the workers of the insulation contractors?
. . . .
A: I don't know.
Q: Okay. Did Lockheed feel it was important that any individuals who worked on their premises in the 1960's, whether they were employees or employees of their subcontractors, did Lockheed believe it was important to try to have a safe workplace for those individuals?
. . . .
A: I don't know.
Q: Did Lockheed retain ultimate control of the safety of subcontractor employees when it came to any work that they would have done involving asbestos-containing insulation?
. . . .
A: I don't know.
. . . .
Q: Is it Lockheed's position in this case... that the insulation subcontractors had all control over the insulation work that their workers were doing at Lockheed Shipbuilding Company in the 1960s?
. . . .
A: I don't know.
. . . .
Q: Can you tell me any piece of evidence that you are aware of as Lockheed's corporate representative to dispute ... whether Lockheed retained control over insulation subcontractors in the 1960's as it pertained, one, to safety and, two, to the specifications of the materials that they were to be working with?
. . . .

*168 A: If there is evidence, it will be in the 13,000 boxes. I'm sorry.
CP at 504-08.
¶ 21 At another point, Songrady stated, "I don't know if [Lockheed] had any agreement with [its] subcontractors or the contractors, but I'm sure that [it] took some sort of precautions for them as well. I'm just guessing. Since [it was] so concerned about [its] own employees, why wouldn't [it] be concerned about other employees?" CP at 487. Martin Ingwersen, a former Lockheed executive, stated that Lockheed sent safety manuals to its subcontractors.
¶ 22 In addition to this deposition testimony, the Arnolds submitted correspondence between the Navy and Lockheed. This correspondence revealed that, in 1969, the Navy asked Lockheed for information about its use of hazardous insulation materials at its Seattle shipyard. In a letter, Lockheed responded that it used asbestos insulation on steam piping, boilers, and diesel exhaust piping. Lockheed enclosed an engineering standardwhich it had provided to at least one insulation subcontractorthat informed contractors about the proper use of insulation on piping and machinery. Lockheed's engineering branch retained control over interpretation of the standard, and quality control personnel were responsible for enforcing the standard. Lockheed also enclosed the Selikoff-Churg-Hammond study,[6] which concluded that asbestosis was a significant hazard among United States insulation workers.
¶ 23 Additionally, the Arnolds submitted an excerpt of Lockheed's "General Procedures" dated July 20, 1981. The "Control of Asbestos Procedure" required workers to take precautions on the jobsite and noted that "a very rare form of lung cancer called mesothelioma" could occur "after prolonged exposure to asbestos fibers." CP at 620. The procedure ordered Lockheed's Director of Material to ensure that insulation contractors submitted an airborne asbestos control plan in compliance with Lockheed's procedures before removing asbestos. Songrady conceded that Lockheed's Director of Material "may have" had some control over Lockheed's subcontractors. CP at 489.
¶ 24 On February 9, 2009, the trial court granted summary judgment to Lockheed, stating:
I am going to grant summary judgment in regards to Daniel and the primary exposure. I just don't think there's any evidence that he was exposed in 1979. That has to be speculation.
I think it's a really close question in regards to what Lockheed's responsibility obligation was to Reuben Arnold. And I did look at the Kamla[[7]] and the Kinney[[8]] cases very closely, and I think that the evidence that is before the Court is that Lockheed didn't have control over the means and manner of the work. Certainly, they had the obligation to coordinate with the subcontractors, and make sure that the timing was right and those kinds of things, but in everything that I looked at, I did not see that they had control of the means and manner of how the work was done, and how the asbestos-related insulation was being installed, and how that worked.
So it is, I think, a pretty close call, but I am going to grant summary judgment in regards to that as well. I don't think Lockheed was the general contractor, and I don't think the statutory duty applies, either.
RP at 31-32. The trial court denied the Arnolds' subsequent motion for reconsideration and granted Lockheed's motion to strike a number of exhibits and an expert's declaration that the Arnolds submitted with their motion.[9] The Arnolds now appeal.

*169 ANALYSIS

I. SUMMARY JUDGMENT
¶ 25 The Arnolds contend that Lockheed owed them a duty to ensure a safe workplace as the general contractor at the Seattle shipyard and that it had a statutory obligation to provide a safe workplace. Further, the Arnolds argue that Lockheed is liable for their injuries because Reuben was an invitee on Lockheed's premises. We conclude that the Arnolds have presented a genuine issue of material fact with regard to whether Lockheed owed Reuben a duty both as a landowner and as a general contractor.

A. STANDARD OF REVIEW
¶ 26 In an action for negligence, a plaintiff must prove the existence of a duty, breach of that duty, resulting injury, and proximate causation. Alhadeff v. Meridian on Bainbridge Island, LLC, 167 Wash.2d 601, 618, 220 P.3d 1214 (2009). Whether a duty exists in the negligence context is a question of law that we review de novo. Aba Sheikh v. Choe, 156 Wash.2d 441, 448, 128 P.3d 574 (2006).
¶ 27 We review summary judgment orders de novo. Lunsford v. Saberhagen Holdings, Inc., 166 Wash.2d 264, 270, 208 P.3d 1092 (2009). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We consider facts and reasonable inferences in the light most favorable to the nonmoving party. McNabb v. Dep't of Corrs., 163 Wash.2d 393, 397, 180 P.3d 1257 (2008). We are reluctant to grant summary judgment when "material facts are particularly within the knowledge of the moving party." Riley v. Andres, 107 Wash.App. 391, 395, 27 P.3d 618 (2001). In such cases, the matter should proceed to trial "in order that the opponent may be allowed to disprove such facts by cross-examination and by the demeanor of the moving party while testifying." Mich. Nat'l Bank v. Olson, 44 Wash. App. 898, 905, 723 P.2d 438 (1986).

B. DANIEL'S PRIMARY EXPOSURE CLAIM
¶ 28 We affirm the trial court's grant of summary judgment with respect to Daniel's primary exposure claim. Daniel fails to present a genuine issue of material fact that his occupational exposure at Lockheed contributed to his mesothelioma. While working at Lockheed in 1979-80, Daniel wore a protective suit taped at the wrists and ankles, booties, two sets of gloves, and a respirator. Another worker checked to make sure he was "all covered up." CP at 3708. After a day's work, the insulation workers threw away all the protective gear except the respirator. Dr. Hammar suggested that Daniel's protective clothing and respirator would protect him from the levels of asbestos exposure needed to cause mesothelioma. Therefore, we focus on Daniel's take-home exposure claim.

C. LOCKHEED'S STATUS AS PREMISES OWNER AND/OR GENERAL CONTRACTOR
¶ 29 The parties appear to agree that Lockheed is a "premises owner," but they vigorously dispute whether Lockheed is a "general contractor." Viewed in a light most favorable to the Arnolds, the record supports the view that Lockheed acted as a general contractor. Lockheed constructed and outfitted naval ships at its Seattle shipyard in accordance with the Navy's specifications. Lockheed employed its own workers but also contracted out work to subcontractors. A 1968 contract between Lockheed and Washington State Ferries designates Lockheed as "Contractor" and states that Lockheed will complete work in accordance with stated specifications while providing all "materials, labor, carriage, tools, [and] implements ... for constructing and completing the work provided for in this contract." CP at 630. Under any general understating of the *170 phrase, this evidence supports the argument that Lockheed was a "general contractor."

D. COMMON LAW DUTY OF CARE
¶ 30 An employer of an independent contractor is generally not liable for injuries to the independent contractor's employees. Kelley v. Howard S. Wright Constr. Co., 90 Wash.2d 323, 330, 582 P.2d 500 (1978). An exception exists where the employer retains control over some part of the contractor's work. Kelley, 90 Wash.2d at 330, 582 P.2d 500. An employer retains control if the employer retains "the right to direct the manner in which the work is performed." Kamla v. Space Needle Corp., 147 Wash.2d 114, 121, 52 P.3d 472 (2002). Actual exercise of control over the manner in which the contractor performs the work is not required. Kamla, 147 Wash.2d at 121, 52 P.3d 472. The employer does not retain control by controlling the timing or order of work, by retaining the right to order the work stopped, or by inspecting the contractor's work to ensure adequate progress. Kamla, 147 Wash.2d at 121, 52 P.3d 472 (citing Straw v. Esteem Constr. Co., 45 Wash.App. 869, 875, 728 P.2d 1052 (1986); Bozung v. Condo. Builders, Inc., 42 Wash.App. 442, 447, 711 P.2d 1090 (1985)).
¶ 31 In Kelley, our Supreme Court also articulated a rule that general contractors who maintain supervisory and coordinating authority over multiple contractors in a "common work area[]" are responsible for job safety in those common work areas. 90 Wash.2d at 331-32, 582 P.2d 500. In Kelley, a subcontractor's employee who installed metal decking on a Seattle building suffered brain damage after falling from his fourth floor platform. 90 Wash.2d at 326-27, 582 P.2d 500. The accident occurred in an area where "four different contractors had worked within a short period of time." Kelley, 90 Wash.2d at 332, 582 P.2d 500. Because the general contractor had "supervisory and coordinating authority" over the four contractors, our Supreme Court held that the general contractor "had a duty to see that proper safety precautions were taken in that area to provide the employees with a safe place of work." Kelley, 90 Wash.2d at 332, 582 P.2d 500.
¶ 32 The Kelley court relied on a Michigan Supreme Court case in its discussion of the common work area rule:
Recognizing the authority a general contractor has to influence work conditions on a construction site, the Michigan Supreme Court has moved forthrightly to place ultimate responsibility for job safety in all common work areas on the general contractor. Funk v. General Motors Corp., 392 Mich. 91, 220 N.W.2d 641 (1974). The court there noted the real threat of injury on a construction project, particularly the danger of falling. The best way to ensure that safety precautions are taken, the court reasoned, is to make the general contractor responsible for them.
Kelley, 90 Wash.2d at 331, 582 P.2d 500. The Kelley court adopted the Funk court's rationale for making general contractors responsible for safety in common work areas:
Placing ultimate responsibility on the general contractor for job safety in common work areas will, from a practical, economic standpoint, render it more likely that the various subcontractors being supervised by the general contractor will implement or that the general contractor will himself implement the necessary precautions and provide the necessary safety equipment in those areas.
. . . .
We regard it to be part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen.
Kelley, 90 Wash.2d at 331-32, 582 P.2d 500 (quoting Funk, 220 N.W.2d at 646).[10] Although our Supreme Court has not extensively *171 addressed the common work area rule after Kelley, we have applied the rule. See Weinert v. Bronco Nat'l Co., 58 Wash.App. 692, 693-94, 795 P.2d 1167 (1990) (concluding that general contractor did not owe a legal duty to an injured employee of its subcontractor where there was no evidence that the employee's fall occurred in a "common area" as defined by Kelley); Bozung, 42 Wash. App. at 447, 711 P.2d 1090 (stating that the work site where a subcontractor's employee was injured was not a "common work site" under Kelley because only one subcontractor was "active on the site at the time of the accident"); see also Jones v. Bayley Constr. Co., 36 Wash.App. 357, 362-63, 674 P.2d 679 (1984) overruled on other grounds by, Brown v. Prime Constr. Co., 102 Wash.2d 235, 240 n. 2, 684 P.2d 73 (1984) (relying on Kelley to hold that the trial court committed prejudicial error by refusing to give an injured workers proposed instruction that "the general contractor has a special, nondelegable duty" to workers on its jobsite that is "distinct from the duty" of the workers' direct employer).[11]
¶ 33 We conclude that the Arnolds presented sufficient evidence to successfully resist summary judgment on their claims against Lockheed as a general contractor with control over the common work areas on the ships where Reuben worked. The Arnolds introduced evidence that, at the time of Reuben's employment, Lockheed owned and controlled access to the work site, was the general contractor, provided and enforced standards for installing insulation, monitored and coordinated the work of multiple subcontractors in close quarters below deck, and retained safety oversight over all workers, including subcontractors, on the ships that it constructed at its Harbor Island shipyard.
¶ 34 Furthermore, we note that many facts about the nature of Lockheed's control over the safety and work of its subcontractors remain within Lockheed's knowledge. Lockheed's representative, Songrady, was unable to answer questions about Lockheed's control over its subcontractors' employees, which is the central issue in this case. Rather, she acknowledged that the contents of 13,000 boxes in Lockheed's storage facility would confirm or undermine the Arnolds' claim that Lockheed retained control over its subcontractors. In short, the Arnolds' claim should be tried.

E. COMMON LAW DUTY OF LANDOWNER TO INVITEES
¶ 35 The Arnolds also contend that Lockheed breached its duty to Reuben as an invitee because Lockheed (1) knew of the risk of asbestos exposure when Reuben worked there; (2) should have expected that its subcontractors' employees would be unaware of the danger; and (3) failed to exercise reasonable care because it did not warn workers of the danger, did not provide respirators or showers, and did not require workers to change asbestos-laden clothes after *172 their shift. We agree that the Arnolds have raised a genuine issue of material fact with regard to Lockheed's liability to Reuben as an invitee.
¶ 36 The employees of independent contractors hired by a landowner are invitees on the landowner's premises. Kamla, 147 Wash.2d at 125, 52 P.3d 472. Washington has adopted sections 343 and 343A of the Restatement (Second) of Torts, which define a landowner's duty to invitees. Kamla, 147 Wash.2d at 125, 52 P.3d 472. Section 343 reads:
A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
(c) fails to exercise reasonable care to protect them against the danger.
RESTATEMENT (SECOND) OF TORTS § 343, at 215-216.
¶ 37 Section 343A clarifies that an invitee's awareness of a dangerous condition does not necessarily preclude landowner liability. Iwai v. State, 129 Wash.2d 84, 94, 915 P.2d 1089 (1996). That section states in relevant part:
A possessor of land is not liable to his [or her] invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.
RESTATEMENT (SECOND) OF TORTS § 343A, at 218.
¶ 38 As a threshold matter, Lockheed argues that "alleged hazards associated with construction activity" are not "condition[s] on the land" that trigger a landowner's duty to invitees.' Resp't's Br. at 38-39. In support, Lockheed cites a case in which the court held that a building collapse that killed a worker and that occurred "because the equipment being dismantled helped to anchor the walls of the building" was not "a condition on the land." Resp't's Br. at 38 (citing Morris v. Vaagen Bros. Lumber, Inc., 130 Wash.App. 243, 250, 125 P.3d 141 (2005)). However, Morris is distinguishable. Here, Lockheed invited insulators like Reuben onto its premises to work in hazardous environmental conditions. Asbestos was a regular presence at the shipyard and is thus properly considered a "condition on the land."
¶ 39 We conclude that the Arnolds presented a genuine issue of material fact with regard to whether Lockheed breached its duty to Reuben as an invitee. Lockheed knew that asbestos was hazardous to its workers by 1969, and some evidence in the record suggests that Lockheed may have known earlier. In contrast, several shipyard workers deposed for this litigation stated that they did not know of the dangers of asbestos in the 1960s. Harris formed the asbestos into snowballs and did not learn of the dangers of asbestos until after he left Lockheed in 1975 or 1976. Tanner did not begin wearing a respirator or dust mask until 1982 when the "safety people" raised concerns. CP at 421. Nickell wore a dust mask or respirator for the first time in the early 1970s.[12] The insulators' union did not warn its workers about the dangers of asbestos during the 1966-69 period.
¶ 40 Moreover, the record conflicts as to whether Lockheed exercised reasonable care to protect workers against asbestos. According to Songrady, Lockheed provided locker rooms, changing facilities, and showers to asbestos workers. However, Harris recalled that subcontractors' employees had no access to showers, lockers, or laundry facilities. Harris also stated that workers received no training about the risks of asbestos and that Lockheed did not require workers to wear a mask or respirator around the insulation. Tanner stated that Lockheed never advised workers to take precautions from being exposed *173 to asbestos or to wash their coveralls at an on-site facility rather than at home.
¶ 41 Questions remain about precisely when Lockheed knew about the dangers of asbestos, whether Lockheed should have expected that insulation workers would not realize that danger, and whether Lockheed failed to exercise reasonable care. Therefore, the trial court's grant of summary judgment was inappropriate at this time.
¶ 42 Finally, Lockheed relies on Strong v. Seattle Stevedore Co., 1 Wash.App. 898, 904, 466 P.2d 545 (1970), to argue that it is not liable because Reuben was an "expert insulator" who was more knowledgeable about asbestos risks than Lockheed.[13] Resp't's Br. at 39. Strong, however, pre-dated our Supreme Court's adoption of § 343A of the Restatement as the "appropriate standard for duties to invitees for known or obvious dangers." See Tincani v. Inland Empire Zoological Soc'y, 124 Wash.2d 121, 139, 875 P.2d 621 (1994). Therefore, Lockheed's reliance on Reuben's alleged superior knowledge is misplaced.

F. STATUTORY DUTIES OF CARE
¶ 43 The Arnolds argue that Lockheed owed duties of care to the Arnolds under the Washington Industrial Health and Safety Act (WISHA),[14] former RCW 49.16.030 (1919), repealed by, LAWS OF 1973, ch. 80, § 28, and the federal Walsh-Healey Act.[15]
¶ 44 WISHA does not apply to the Arnolds' claims because the legislature enacted WISHA after Reuben's exposure to asbestos in the 1960s. See Laws of 1973, ch. 80. On remand, however, the Arnolds may assert that Lockheed breached its statutory duty under WISHA's predecessor statute, former RCW 49.16.030,[16], which was in effect at the time of Reuben's exposure. Our Supreme Court interpreted former RCW 49.16.030 in Bayne v. Todd Shipyards Corp., 88 Wash.2d 917, 568 P.2d 771 (1977), stating:
[Former RCW 49.16.030] requires a safe place of work for workmen. It does not limit it to employees of the defendant employer. A worker who is lawfully on the premises in pursuit of his own employment and at the invitation of the third party, defendant here, is entitled to the benefit of the statute and the regulation.
88 Wash.2d at 920, 568 P.2d 771 (citation omitted). Although the legislature's enactment of RCW 5.40.050,[17] which abolished the doctrine of negligence per se in Washington, superseded Bayne's holding that a violation of an administrative regulation is negligence per se, Bayne's interpretation that former RCW 49.16.030 requires a safe workplace for all workersnot just the employer's direct employeesis still binding authority. See Gilbert H. Moen Co. v. Island Steel Erectors, Inc., 128 Wash.2d 745, 756, 912 P.2d 472 (1996) (noting Kelley's holding that a "general contractor had a nondelegable duty under [former RCW 49.16.030] to ensure the safety of all workers on a jobsite."). Therefore, on remand, the Arnolds may argue to the jury, as part of their common law negligence claim, that Lockheed's breach of its statutory *174 duty under former RCW 49.16.030 is evidence of Lockheed's negligence.
¶ 45 Next, we conclude that the Walsh-Healey Act does not create a duty on the part of Lockheed that runs to the Arnolds. The Act requires parties who contract with the United States to manufacture or furnish materials, supplies, articles, or equipment in any amount exceeding $10,000 to agree to contract provisions that they will provide a safe workplace. 41 U.S.C. § 35(d). The Act gives the United States a cause of action for breach of contract, allowing it to seek liquidated damages and other statutory penalties. 41 U.S.C. § 36. Nowhere does the Act suggest that a third party may enforce a contractor's breach of the Act's workplace provisions through a negligence lawsuit. The primary case that the Arnolds rely on to assert that the Act gives rise to such a dutyZimko v. American Cyanamid, 905 So.2d 465 (La.Ct.App.2005)is unpersuasive. The Zimko court did not address the issue of third party enforcement, and it emphasized that a "no-duty defense" to a negligence claim is limited to exceptional situations under Louisiana law, which is not the case in Washington. 905 So.2d at 481-83.
¶ 46 We affirm the trial court's grant of summary judgment to Lockheed for Daniel's primary exposure claim, but we reverse the trial court's grant of summary judgment to Lockheed for all other claims.[18]
¶ 47 Neither party requests attorney fees. We award reasonable costs to the Arnolds because they substantially prevail in this appeal. See RAP 14.2.
We concur: ARMSTRONG and VAN DEREN, JJ.
NOTES
[1] To avoid confusion, we refer to the plaintiffs individually by their first names and collectively as "the Arnolds." We intend no disrespect.
[2] Marjorie appeals individually and as the personal representative of Reuben's estate. Daniel appeals individually. Although Daniel recently died of mesothelioma, we refer to him throughout because his personal representative is not identified.
[3] It appears that Reuben did not work at Lockheed after 1969. The Arnolds suggested that Reuben worked at Lockheed in 1976 in their answer to Lockheed's interrogatories, but on appeal they state that Reuben worked at Lockheed in 1962-1963, 1967-68, and 1969.
[4] Mesothelioma is "[a] rare neoplasm derived from the lining cells of the pleura and peritoneum which grows as a thick sheet covering the viscera." Stedman's Medical Dictionary 1096 (26th ed.1995).
[5] The Arnolds state that they have settled with all of the other defendant companies. The record shows that the trial court granted summary judgment to at least two defendants, D & G Mechanical Insulation, Inc., and Saberhagen Holdings, Inc.
[6] I.J. SELIKOFF, J. CHURG, & E.C. HAMMOND, The Occurrence of Asbestosis Among Insulation Workers in the United States, 132 ANNALS N.Y. ACAD. OF SCIS. 139-155 (1965).
[7] Kamla v. Space Needle Corp., 147 Wash.2d 114, 52 P.3d 472 (2002).
[8] Kinney v. Space Needle Corp., 121 Wash.App. 242, 85 P.3d 918 (2004).
[9] The Arnolds' motion contained numerous exhibits, most of which pertained to Reuben's exposure to Limpet asbestos, a spray-on insulation product, while he worked on the Alaska ferries at Lockheed. The Arnolds assert that Limpet asbestos fibers are 100 to 500 times more likely to cause mesothelioma as the type of asbestos fibers typically sold in the United States. The expert's declaration that the Arnolds submitted with the motion stated that the Limpet asbestos used on the Alaska ferries at Lockheed would have violated the then-existing air standard for asbestos exposure.
[10] Our Supreme Court observed that "[a]lthough Funk was effectively overruled by Hardy v. Monsanto Enviro-Chem Sys., Inc., 414 Mich. 29, 323 N.W.2d 270 (1982), on the issue of contributory negligence, its reasoning with respect to the duty of general contractors is still sound and accepted." Stute v. P.B.M.C., Inc., 114 Wash.2d 454, 462, 788 P.2d 545 (1990).
[11] We note that the retained control doctrine and the common work area doctrine appear to overlap in the case of general contractor liability. See, e.g., Tauscher v. Puget Sound Power and Light Co., 96 Wash.2d 274, 278, 635 P.2d 426 (1981) (stating that "[o]ur decision [in Kelley] ... was primarily based on the fact that ... the general contractor on a multi-employer project[] retained control over the common work area and thus had the duty, within the scope of that control, to provide a safe place to work for all employees."). While we need not determine the exact scope of each doctrine to resolve the issue before us, we note that the Michigan Supreme Court recently clarified the relationship between these two doctrines in light of post-Funk confusion. Ormsby v. Capital Welding, Inc., 471 Mich. 45, 684 N.W.2d 320 (2004). The Ormsby court stated:

We ... clarify today that these two doctrines are not two distinct and separate exceptions, rather only onethe "common work area doctrine"is an exception to the general rule of nonliability for the negligent acts of independent subcontractors and their employees.... [T]he "retained control doctrine" is a doctrine subordinate to the "common work area doctrine" and is not itself an exception to the general rule of nonliability. Rather, it simply stands for the proposition that when the Funk "common work area doctrine" would apply, and the property owner has sufficiently "retained control" over the construction project, that owner steps into the shoes of the general contractor and is held to the same degree of care as the general contractor. Thus, the "retained control doctrine," in this context, means that if a property owner assumes the role of a general contractor, such owner assumes the unique duties and obligations of a general contractor.
684 N.W.2d at 323.
[12] Reuben stated in his deposition that he was not aware of the dangers of asbestos until the 1970s.
[13] In Strong, the court found that the family of a fireman who died while fighting a fire on the Tacoma pier could not recover in a wrongful death action because the fireman had "superior knowledge" of the fire's hazardous character based on such characteristics as the color and odor of the smoke. 1 Wash.App. at 899, 904, 466 P.2d 545.
[14] Chapter 49.17 RCW.
[15] 41 U.S.C. §§ 35-45.
[16] Former RCW 49.16.030 reads:

[I]t shall be the duty of every employer to furnish a place of work which shall be as safe for workmen therein as may be reasonable and practicable under the circumstances, surroundings and conditions, and to furnish and use such safety devices and safeguards and to adopt and use such practices, means, methods, operations and processes as under the circumstances, surroundings and conditions are reasonable and practical in order to render the work and place of work safe, and to comply with such standards of safety of place of work and such safety devices and safeguards and such standards and systems of education for safety as shall be from time to time prescribed for such employer by the director of labor and industries through the division of safety, or by statute, or by the state mining board.
[17] The legislature enacted RCW 5.40.050 in 1986. Laws of 1986, ch. 305, § 901. It has amended RCW 5.40.050 two times in a manner that does not affect our analysis. Laws of 2009, ch. 412, § 20; Laws of 2001, ch. 194, § 5.
[18] The Arnolds assign error to the trial court's order denying their motion for reconsideration and granting Lockheed's motion to strike. We do not need to address this assignment of error because we reverse the trial court's grant of summary judgment to Lockheed.