## NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MARIA FARIAS, as personal representative of the ESTATE OF RUBEN FARIAS on behalf of beneficiaries MARIA FARIAS, MIRIAM FARIAS PARDO, MIREYA FARIAS PARDO, a minor, and JOSELYN FARIAS PARDO, a minor,<br><br>                 Appellants,<br><br>       v.<br><br>THE PORT BLAKELY COMPANY, a Washington corporation; and PORT BLAKELY TREE FARMS (LIMITED PARTNERSHIP), a Washington limited partnership,<br><br>               Respondents. | DIVISION ONE<br><br>No. 82789-8-I<br><br>PUBLISHED OPINION |

DWYER, J. — Maria Farias appeals from the trial court's orders denying her motion for partial summary judgment and granting the motion for summary judgment of Port Blakely Company and Port Blakely Tree Farms (collectively Port Blakely). Farias asserts that the trial court erred by denying her motion for partial summary judgment because, according to Farias, undisputed facts established that Port Blakely was a general contractor rather than a mere jobsite owner. Additionally, Farias contends that the trial court erred by granting Port Blakely's motion for summary judgment because genuine issues of material fact exist as to whether Port Blakely owed both a common law duty to provide a safe workplace and a statutory duty to comply with the Washington Industrial Safety and Health

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Act of 1973 (WISHA).[1]  Because Farias fails to establish an entitlement to relief on any of her claims, we affirm.

I

Port Blakely was the owner of a parcel of land in Lewis County known as "Lost Mower."  Port Blakely contracted with numerous contractors, including Buck's Logging, Inc. (BLI), to harvest timber located on this land.  Under its contract with Port Blakely, BLI was to, among other things, "cut, fall, [and] buck . . . the Timber" located on the land.  Ruben Farias was an employee of BLI.

In January 2020, BLI commenced work at Lost Mower.  On the day in question, an employee of BLI, Bryce Lyons, instructed Ruben[2] to buck[3] logs that were stacked on a landing.[4]  When Ruben was bucking the logs, he was not consistently in visual or audible range of the other workers at the jobsite.  Between 20 and 30 minutes after Bryce Lyons had instructed Ruben to buck logs, Bryce Lyons discovered Ruben's body pinned between two logs.  Thereafter, Bryce Lyons and the owner of BLI, Brad Lyons, "pulled the logs apart" and "pulled Ruben out of there."  Bryce Lyons then attempted to perform cardiopulmonary resuscitation, but Ruben was already dead.

An accident report describing the incident provided:

> While bucking the last tree it is possible [Ruben] got his saw hung up.  Saw marks in the cut show that the saw was being pinched. . . .  Tops of the trees being bucked were touching each other.  We believe when the cut broke apart, the top of the tree

---

[1] Ch. 49.17 RCW.

[2] For clarity, we refer to the decedent by his first name.  No disrespect is intended.

[3] "Buck" is defined as "the process of severing a tree into sections (logs or bolts)."  WAC 296-54-505.

[4] A "[l]anding" is "[a]ny place where logs are laid after being yarded, awaiting subsequent handling, loading, and hauling."  WAC 296-54-505.

No. 82789-8-I/3

being bucked hit the top of the tree behind [Ruben] causing that
tree to slide or roll toward him, pinning him.

On July 24, 2020, Ruben's widow, Maria Farias, filed a complaint against Port Blakely in King County Superior Court. The complaint alleged that Port Blakely was "[a]cting as the general contractor" for the Lost Mower project and also "retained control over the manner in which work was performed." Farias asserted that Port Blakely breached both its common law duty to provide a safe workplace and its statutory duty to comply with WISHA regulations.

On April 23, 2021, Port Blakely filed a motion for summary judgment. In this motion, Port Blakely sought a summary judgment determination that it owed Ruben neither a common law duty to provide a safe workplace nor a statutory duty to comply with WISHA regulations.

Also on April 23, Farias filed a motion for partial summary judgment in which she requested a summary judgment determination that Port Blakely was a general contractor.

On May 21, 2021, the trial court heard both motions for summary judgment. On May 25, the trial court entered an order granting Port Blakely's motion. That same day, the trial court entered an order denying Farias's motion.

Farias appeals.

II

A

We begin by clarifying the common law duty to provide a safe workplace. To establish direct liability in negligence, a plaintiff must establish "'the existence of a duty . . . , breach of the duty, and injury to plaintiff proximately caused by the

3

breach.'" Crisostomo Vargas v. Inland Wash., LLC, 194 Wn.2d 720, 730, 452 P.3d 1205 (2019) (alteration in original) (internal quotation marks omitted) (quoting Harper v. Dep't of Corr., 192 Wn.2d 328, 340, 429 P.3d 1071 (2018)). "'Existence of a duty is a question of law.'" Crisostomo Vargas, 194 Wn.2d at 730 (quoting Hertog, ex rel. S.A.H. v. City of Seattle, 138 Wn.2d 265, 275, 979 P.2d 400 (1999)).

"At common law, a principal who hires an independent contractor is not liable for harm resulting from the contractor's work. In particular, the principal has no duty to maintain a safe workplace for a contractor's employees and is not liable for their injuries." Afoa v. Port of Seattle, 176 Wn.2d 460, 476, 296 P.3d 800 (2013) (Afoa I) (citation omitted). "An 'independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.'" Kamla v. Space Needle Corp., 147 Wn.2d 114, 119, 52 P.3d 472 (2002) (quoting RESTATEMENT (SECOND) OF AGENCY § 2(3) (1958)).[5]

Our Supreme Court has clarified that, "[u]nder our common law safe workplace doctrine, *landowners and general contractors* that retain control over a work site have a duty to maintain safe common work areas." Afoa I, 176 Wn.2d at 475 (emphasis added) (citing Kelley v. Howard S. Wright Constr. Co., 90 Wn.2d 323, 331-32, 582 P.2d 500 (1978); Kamla, 147 Wn.2d at 121-22). In

---

[5] By contrast, "employees are 'agent[s] employed by [an employer] to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the [employer].'" Kamla, 147 Wn.2d at 119 (alterations in original) (quoting RESTATEMENT § 2(2)).

4

No. 82789-8-I/5

other words, "where a principal retains control over 'some part of the work,' we disregard the 'independent contractor' designation and require the principal . . . to maintain safe common workplaces for all workers on the site." Afoa I, 176 Wn.2d at 477 (quoting Kelley, 90 Wn.2d at 330). Thus, "the relevant inquiry is whether the principal retained control over the work site, not whether there was a direct employment relationship between the parties." Afoa I, 176 Wn.2d at 477.

Notably, "[c]ommon law liability for injuries to independent contractors and their employees exists where control is retained over *the manner* in which the work is completed." Kamla, 147 Wn.2d at 127 (emphasis added). Furthermore, the principal "has a duty, *within the scope of that control*, to provide a safe place of work." Kelley, 90 Wn.2d at 330 (emphasis added); accord Crisostomo Vargas, 194 Wn.2d at 731.

In Crisostomo Vargas, our Supreme Court explained that a "general contractor's 'general supervisory functions [are] sufficient to establish control.'" 194 Wn.2d at 733 (quoting Kelley, 90 Wn.2d at 331). "If a general contractor has the authority to supervise a given area, then it must ensure that the area is safe." Crisostomo Vargas, 194 Wn.2d at 733. Additionally, "a general contractor with supervisory authority over an area must ensure that the area is safe regardless of whether the general contractor is present—a general contractor cannot shirk its duties merely by vacating the premises." Crisostomo Vargas, 194 Wn.2d at 733.

5

Two decades ago, our Supreme Court clarified the degree of control that must be exerted in order for a principal—in that case, a jobsite owner—to owe a common law duty to provide a safe workplace:

> "[T]he employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."

Kamla, 147 Wn.2d at 121 (alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)).

When a general contractor or jobsite owner owes a common law duty of care to provide a safe workplace, that duty is nondelegable. Crisostomo Vargas, 194 Wn.2d at 738 (general contractor's common law duty of care to provide a safe workplace is nondelegable); Afoa v. Port of Seattle, 191 Wn.2d 110, 121, 421 P.3d 903 (2018) (Afoa II) (jobsite owner's common law duty of care to provide a safe workplace is nondelegable). "An entity that delegates its nondelegable duty will be vicariously liable for the negligence of the entity subject to its delegation." Afoa II, 191 Wn.2d at 124.

In sum, under the common law, a general contractor or a jobsite owner who retains control over some part of a work site has a duty, within the scope of that retained control, to provide a safe place of work.

No. 82789-8-I/7

B

A general contractor or a jobsite owner may also owe a duty of care under WISHA to comply with WISHA regulations. However, the analysis for determining whether such a duty of care is owed under WISHA differs with respect to general contractors and jobsite owners. See Crisostomo Vargas, 194 Wn.2d at 740 ("[W]e have always treated jobsite owners differently from general contractors.").

The basis for liability under WISHA stems from RCW 49.17.060, which provides:

> Each employer:
>     (1) Shall furnish to each of his or her employees a place of employment free from recognized hazards that are causing or likely to cause serious injury or death to his or her employees: PROVIDED, That no citation or order assessing a penalty shall be issued to any employer solely under the authority of this subsection except where no applicable rule or regulation has been adopted by the department covering the unsafe or unhealthful condition of employment at the workplace; and
>     (2) Shall comply with the rules, regulations, and orders promulgated under this chapter.

Our Supreme Court has clarified the scope of the two duties that arise from this statute:

> Subsection (1) creates a "'general duty'" to maintain a workplace free from recognized hazards; this duty runs only from an employer to its [own] employees. Subsection (2), on the other hand, creates a "'specific duty'" for employers to comply with WISHA regulations. Unlike the general duty, the specific duty runs to *any* employee who may be harmed by the employer's violation of the safety rules.

Afoa I, 176 Wn.2d at 471 (citations omitted) (quoting Goucher v. J.R. Simplot Co., 104 Wn.2d 662, 671, 709 P.2d 774 (1985); citing Stute v. P.B.M.C., Inc., 114 Wn.2d 454, 460, 788 P.2d 545 (1990)).

7

No. 82789-8-I/8

"A general contractor *always* owes this [specific] duty under WISHA—no analysis of whether the general contractor retained control is necessary." Crisostomo Vargas, 194 Wn.2d at 736. Indeed, our Supreme Court has explained that its "precedent . . . places 'prime responsibility for safety of all workers . . . on the general contractor' because 'the general contractor is in the best position to coordinate work or provide expensive safety features to protect employees of subcontractors.'" Crisostomo Vargas, 194 Wn.2d at 736 (second alteration in original) (citation omitted) (quoting Stute, 114 Wn.2d at 462-63).

In addition to being directly liable under WISHA, a general contractor may also be vicariously liable under WISHA in two ways:

> First, a general contractor that delegates its statutory duty to comply with WISHA is "vicariously liable for the negligence of the entity subject to its delegation." Afoa II, 191 Wn.2d at 124. Second, a general contractor is vicariously liable for the negligence of any entity over which it exercises control. Id. at 122-24.

Crisostomo Vargas, 194 Wn.2d at 738 (citing Millican v. N.A. Degerstrom, Inc., 177 Wn. App. 881, 893, 313 P.3d 1215 (2013)).

Jobsite owners, however, do *not* always owe a specific duty under WISHA:

> Our first question is whether jobsite owners are per se liable under the statutory requirements of RCW 49.17.060. They are not. Nothing in chapter 49.17 RCW specifically imposes a duty upon jobsite owners to comply with WISHA. The second question is whether jobsite owners play a role sufficiently analogous to general contractors to justify imposing upon them the same nondelegable duty to ensure WISHA compliance when there is no general contractor. We hold they do not.
> . . . Because a general contractor is in the best position, financially and structurally, to ensure WISHA compliance or provide safety equipment to workers, we place "the prime responsibility for

8

No. 82789-8-I/9

> safety of all workers . . . on the general contractor." Stute, 114
> Wn.2d at 463. The same is not true of jobsite owners.

Kamla, 147 Wn.2d at 123-24.

In making this distinction between the duty owed by a general contractor

and the duty owed by a jobsite owner under WISHA, the Kamla court explained:

> Although jobsite owners may have a similar degree of
> authority to control jobsite work conditions, they do not necessarily
> have a similar degree of knowledge or expertise about WISHA
> compliant work conditions. Jobsite owners can run the gamut from
> an owner/developer with the same degree of knowledge about
> WISHA compliant work conditions as that of a general contractor to
> a public corporation without any knowledge about WISHA
> regulations governing a specific trade. Because jobsite owners
> may not have knowledge about the manner in which a job should
> be performed or about WISHA compliant work conditions, it is
> unrealistic to conclude all jobsite owners necessarily control work
> conditions. Instead, some jobsite owners may reasonably rely on
> the contractors they hire to ensure WISHA compliance because
> those jobsite owners cannot practically instruct contractors on how
> to complete the work safely and properly.
> If a jobsite owner does not retain control over the manner in
> which an independent contractor completes its work, the jobsite
> owner does not have a duty under WISHA to "comply with the
> rules, regulations, and orders promulgated under [chapter 49.17
> RCW]." RCW 49.17.060(2).

147 Wn.2d at 124-25.

Thus, when a jobsite owner retains control over *the manner* in which an

independent contractor performs its work, the jobsite owner owes a duty to

comply with WISHA regulations. Kamla, 147 Wn.2d at 125; accord Afoa I, 176

Wn.2d at 473 ("We hold only that jobsite owners must comply with WISHA

regulations if they retain control over the manner and instrumentalities[6] of work

done at the jobsite.").

---

[6] In Afoa I, the court did not clarify what, exactly, "instrumentalities" means. The court also did not suggest that its use of this word changed the analysis set forth in Kamla.

9

No. 82789-8-I/10

In such a circumstance, a jobsite owner may be held vicariously liable under RCW 49.17.060(2) in two ways. First, a jobsite owner may be vicariously liable under this statutory provision for the negligence of an entity over which it exercises sufficient control. Afoa II, 191 Wn.2d at 124 ("The [jobsite owner] can still be vicariously liable for [an entity's] negligence if the jury makes the necessary finding of control."). Second, a jobsite owner that both exercises sufficient control and delegates its specific duty under WISHA is "vicariously liable for the negligence of the entity subject to its delegation." Afoa II, 191 Wn.2d at 124.

III

Having clarified the different analyses applicable when determining whether a general contractor or a jobsite owner has a duty under either the common law or WISHA, we first address whether Port Blakely was a general contractor or a mere jobsite owner. Farias contends that the trial court erred by denying her motion for partial summary judgment in which she sought a ruling that Port Blakely was a general contractor. Because each of Farias's arguments is without merit, we hold that Port Blakely was properly ruled not to be a general contractor and, instead, was properly determined to be a mere jobsite owner.

A

We review an order granting summary judgment de novo, performing the same inquiry as the trial court. Nichols v. Peterson Nw., Inc., 197 Wn. App. 491, 498, 389 P.3d 617 (2016). In so doing, we draw "all inferences in favor of the

_____

Accordingly, we do not perceive the Afoa I court's use of the word "instrumentalities" as altering the rule articulated in Kamla.

10

No. 82789-8-I/11

nonmoving party." U.S. Oil & Ref. Co. v. Lee & Eastes Tank Lines, Inc., 104 Wn. App. 823, 830, 16 P.3d 1278 (2001).  Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  CR 56(c).  "[S]ummary judgment is inappropriate where the existence of a legal duty depends on disputed material facts."  Afoa I, 176 Wn.2d at 466.

B

Farias first cites to a notable legal dictionary's definition of "general contractor" to support her argument that Port Blakely was a general contractor. This dictionary defines "general contractor" as "[s]omeone who contracts for the completion of an entire project, including purchasing all materials, *hiring and paying subcontractors*, and coordinating all the work. – Also termed *original contractor*; *prime contractor*."  BLACK'S LAW DICTIONARY 413 (11th ed. 2019) (first emphasis added).  Notably, this same dictionary defines "subcontractor" as

> [s]omeone who is awarded *a portion of an existing contract* by a contractor, esp. a general contractor.  For example, a contractor who builds houses typically retains subcontractors to perform specialty work such as installing plumbing, laying carpet, making cabinetry, and landscaping — each subcontractor is paid a somewhat lesser sum than the contractor receives for the work.

BLACK'S, supra, at 1722 (emphasis added).

Similarly, "subcontract" is defined as "[a] *secondary* contract made by a party to the *primary* contract for carrying out the *primary* contract, or a part of it." BLACK'S, supra, at 410 (emphasis added).

11

Here, there was no primary contract that Port Blakely awarded a portion of to BLI. Therefore, this definition of general contractor is of no aid to Farias.[7]

Farias also quotes one sentence from Afoa I in support of its argument that Port Blakely was a general contractor. In that opinion, our Supreme Court stated: "In Kamla, we held that although general contractors and similar employers *always* have a duty to comply with WISHA regulations, the person or entity that owns the jobsite is not per se liable for WISHA violations." Afoa I, 176 Wn.2d at 472. According to Farias, Port Blakely should be considered a "similar employer" that is per se liable for WISHA violations.

Contrary to the language used by the court in Afoa I, however, Kamla did *not* hold that employers who are "similar" to general contractors always have a duty to comply with WISHA violations. In Kamla, our Supreme Court addressed an earlier opinion wherein we held that a jobsite owner was so comparable to a general contractor that the jobsite owner was per se liable for WISHA violations:

> The court of appeals has extended Stute's nondelegable duty of ensuring WISHA compliant work conditions to parties other than general contractors. In Weinert v. Bronco Nat'l Co., 58 Wn. App. 692, 795 P.2d 1167 (1990), Bronco, an owner/developer, hired a contractor to install siding. The contractor, in turn, subcontracted with Adrey Construction, by whom Weinert was employed. Weinert, 58 Wn. App. at 693. After Weinert fell off scaffolding erected by Adrey Construction, he sued Bronco arguing Bronco owed him a specific duty to comply with WISHA regulations.

---

[7] Farias also cites to Arnold v. Saberhagen Holdings, Inc., 157 Wn. App. 649, 240 P.3d 162 (2010), in support of her argument. In that case, the court held that a "premises owner," Lockheed, was also a general contractor. In that instance, however, a primary contract existed which provided that "Lockheed and Washington State Ferries designates Lockheed as 'Contractor' and states that Lockheed will complete work in accordance with stated specifications while providing all 'materials, labor, carriage, tools, [and] implements . . . for constructing and completing the work provided for in this contract.'" Arnold, 157 Wn. App. at 662-63. The plaintiff's employer in that case was a subcontractor of Lockheed. Arnold, 157 Wn. App. at 663. Because Port Blakely was not a contractor under any primary contract, Arnold is of no aid to Farias.

12

No. 82789-8-I/13

Holding Bronco could be liable, the Court of Appeals pointedly noted, "Stute . . . rejected the contention that before [the specific] duty could be imposed, there must be proof the general contractor controlled the work of the subcontractor." Weinert, 58 Wn. App. at 696. The Weinert court acknowledged Bronco was an owner/developer rather than a general contractor, but employed the Stute rule because "[t]he owner/developer's position [was] so comparable to that of the general contractor in Stute that the reasons for the holding in Stute [applied]." Weinert, 58 Wn. App. at 696.

147 Wn.2d at 122-23.

However, after discussing the holding in Weinert, the Kamla court expressly held that, on a categorical basis, jobsite owners do *not* play a role sufficiently analogous to general contractors to necessitate the per se imposition of WISHA liability:

Our first question is whether jobsite owners are per se liable under the statutory requirements of RCW 49.17.060. They are not. Nothing in chapter 49.17 RCW specifically imposes a duty upon jobsite owners to comply with WISHA. *The second question is whether jobsite owners play a role sufficiently analogous to general contractors to justify imposing upon them the same nondelegable duty to ensure WISHA compliance when there is no general contractor. We hold they do not.*
. . . Because a general contractor is in the best position, financially and structurally, to ensure WISHA compliance or provide safety equipment to workers, we place "the prime responsibility for safety of all workers . . . on the general contractor." Stute, 114 Wn.2d at 463. The same is not true of jobsite owners.
Although jobsite owners may have a similar degree of authority to control jobsite work conditions, they do not necessarily have a similar degree of knowledge or expertise about WISHA compliant work conditions. *Jobsite owners can run the gamut from an owner/developer with the same degree of knowledge about WISHA compliant work conditions as that of a general contractor to a public corporation without any knowledge about WISHA regulations governing a specific trade.* Because jobsite owners may not have knowledge about the manner in which a job should be performed or about WISHA compliant work conditions, it is unrealistic to conclude all jobsite owners necessarily control work conditions. Instead, some jobsite owners may reasonably rely on

13

No. 82789-8-I/14

> the contractors they hire to ensure WISHA compliance because those jobsite owners cannot practically instruct contractors on how to complete the work safely and properly.
>
>> *If a jobsite owner does not retain control over the manner in which an independent contractor completes its work, the jobsite owner does not have a duty under WISHA to "comply with the rules, regulations, and orders promulgated under [chapter 49.17 RCW]."* RCW 49.17.060(2).

147 Wn.2d at 123-25 (emphasis added).

Thus, Kamla explicitly rejected a rule under which jobsite owners who are "sufficiently analogous to general contractors" would be per se liable for WISHA violations. Rather, Kamla requires a showing that a jobsite owner retained control over the manner in which a contractor performed its work in order for the jobsite owner to owe a specific duty under WISHA. The court in Afoa I reiterated this holding when it held that "jobsite owners must comply with WISHA regulations if they retain control over the manner and instrumentalities of work done at the jobsite."[8] 176 Wn.2d at 473.

Indeed, we have previously interpreted the Kamla opinion as abrogating our decision in Weinert:

---

[8] The court in Afoa I also stated, in dicta, that the jobsite owner in that case was closely analogous to a general contractor:

> The Port [of Seattle] operates a major airport facility, is responsible for its own employees, and allows controlled access to thousands of employees of other employers. Under these circumstances, the Port is closely analogous to a general contractor.

176 Wn.2d at 474.

This language is best interpreted to mean that, because the Port of Seattle retained sufficient control over the manner in which work was performed at the jobsite, the Port owed the same duty that a general contractor would owe under WISHA. Furthermore, this statement was made in response to an argument that was raised in the dissenting opinion wherein "[t]he dissent expresse[d] concern that WISHA duties should be limited to 'the employment situation,' either direct employment or employer-subcontractor relationships." Afoa I, 176 Wn.2d at 473-74. As such, this statement should not be interpreted to announce a new rule that, when a jobsite owner is "closely analogous" to a general contractor, the jobsite owner has a per se duty to comply with WISHA regulations.

14

Appellate courts have, in certain situations, applied the Stute rule to jobsite owners. For example, in Weinert v. Bronco National Co., the court acknowledged that Bronco was an owner-developer and not a general contractor but reasoned that the Stute rule applied because Bronco's position was "so comparable to that of the general contractor in Stute." The court pointed out that the basis for imposing the nondelegable duty to enforce WISHA compliance "exists with respect to an owner/developer who, like the general contractor, has the same innate overall supervisory authority and is in the best position to enforce compliance with safety regulations."

But in Kamla v. Space Needle Corp., our Supreme Court held that the Stute rule does not apply per se to a jobsite owner, even when there is no general contractor. The court explained that while jobsite owners may have a similar degree of authority as general contractors, they do not necessarily control work conditions and may not be in the best position to enforce WISHA regulations[.]

. . . .

In sum, RCW 49.17.060(2) imposes a specific duty on employers to comply with applicable WISHA regulations to protect all employees on the work site. Under Stute, general contractors have a nondelegable duty to ensure WISHA compliance. This duty, however, does not extend to owners that do not retain the right to control the manner in which the independent contractor and its employees perform their work.

Neil v. NWCC Invs. V, LLC, 155 Wn. App. 119, 126-27, 229 P.3d 837 (2010)

(footnotes omitted) (citing Kamla, 147 Wn.2d at 123-24; Weinert, 58 Wn. App. at

696).

In Neil, we also expressly rejected an argument that a jobsite owner was

"similar enough" to a general contractor to be required to comply with WISHA

regulations:

[A]ppellants argue that [the jobsite owner], through its agent, [an independent contractor], acted in a manner similar enough to a general contractor to justify imposing a nondelegable duty to ensure WISHA compliance. . . .

. . . .

[However], "[t]he relevant distinction between an agent and an independent contractor is whether the owner has 'the right to control the method or manner in which the work was to be done.'"

15

No. 82789-8-I/16

> "'Control is not established if the asserted principal retains the right to supervise the asserted agent merely to determine if the agent performs in conformity with the contract. Instead, control establishes agency only if the principal controls the manner of performance.'"

155 Wn. App. at 131-32 (footnotes omitted) (quoting Kelsey Lane Homeowners

Ass'n v. Kelsey Lane Co., 125 Wn. App. 227, 236-37, 103 P.3d 1256 (2005);

Stansfield v. Douglas County, 107 Wn. App. 1, 18, 27 P.3d 205 (2001)).[9]

---

[9] We also note that Port Blakely asserts that it was not a general contractor because it does not fit within the definition of "general contractor" as contained within the contractor registration statute (CRA), chapter 18.27 RCW. In Neil, we rejected this very argument:

> Appellants nonetheless contend that [the jobsite owner] owed [an employee of an independent contractor] a statutory duty of care because it meets the definition of a "general contractor" under the contractor registration statute (CRA), chapter 18.27 RCW. Under RCW 18.27.010(5), a "general contractor" is defined as
>
>> a contractor whose business operations require the use of more than one building trade or craft upon a single job or project or under a single building permit. A general contractor also includes one who superintends, or consults on, in whole or in part, work falling within the definition of a contractor.
>
> Focusing on the definition's first sentence, appellants claim [the jobsite owner] is a general contractor with a nondelegable duty to ensure WISHA compliance because it employed more than one trade to work on [the project]. Appellants further insist that this definition applies because no case or statute defines the term "general contractor" in the context of RCW 49.17.060 and that this is the only statutory definition of the term.
>
> But nothing in the CRA specifically imposes this nondelagable duty on business entities falling under the statutory definition of a "general contractor." The legislature enacted the CRA to protect the public from unreliable, fraudulent, financially irresponsible, or incompetent contractors. [RCW 18.27.140.] Under the act, all construction contractors are required to register with the Department of Labor and Industries. [RCW 18.27.020(1).] To register, contractors must submit an application that satisfies certain general requirements. [RCW 18.27.030.] In addition to the general requirements, contractors must file with the department a surety bond for $12,000 if a general contractor or $6,000 if a specialty contractor. [RCW 18.27.040(1).]
>
> Furthermore, specific provisions in the CRA affirmatively undermine appellants' argument. For example, the introduction to RCW 18.27.010 states, "The definitions in this section apply throughout this chapter unless the context clearly requires otherwise." In addition, RCW 18.27.090(11), which exempts from the chapter's registration requirements an owner who contracts for a project with a registered contractor, provides some evidence that the legislature did not intend to treat owners contracting with registered contractors the same as general contractors performing work for others. In this way, the exemption lends support to the policy driven distinction our Supreme Court made between owners and general contractors in Kamla and contrasts with the mechanical approach urged by appellants.

16

No. 82789-8-I/17

Because Farias fails to establish that Port Blakely was a general contractor rather than a mere jobsite owner, the trial court did not err by denying Farias's motion for partial summary judgment.

IV

Having explained that Port Blakely was not a general contractor but, rather, a mere jobsite owner, we must next determine whether Port Blakely retained a sufficient amount of control such that it owed a common law duty to Ruben to provide a safe workplace. Because Farias fails to raise a genuine issue of material fact as to whether Port Blakely retained sufficient control under the common law, we hold that Port Blakely did not owe such a duty.

A

As already explained, a jobsite owner owes a common law duty to provide a safe workplace to workers other than its own employees when the jobsite owner retains sufficient control over the work site. Afoa I, 176 Wn.2d at 475. In particular, "where a principal retains control over 'some part of the work,' we disregard the 'independent contractor' designation and require the principal . . . to maintain safe common workplaces for all workers on the site." Afoa I, 176 Wn.2d at 477 (quoting Kelley, 90 Wn.2d at 330). Thus, "the relevant inquiry is whether the principal retained control over the work site, not whether there was a direct employment relationship between the parties." Afoa I, 176 Wn.2d at 477.

---

Finally, our courts have never interpreted the CRA as imposing a nondelegable duty to ensure WISHA compliance.
155 Wn. App. at 129-31 (footnotes omitted).

17

No. 82789-8-I/18

Additionally, "[c]ommon law liability for injuries to independent contractors and their employees exists where control is retained over *the manner* in which the work is completed." Kamla, 147 Wn.2d at 127 (emphasis added). Sufficient control to establish a common law duty exists under the following conditions:

> "[T]he employer must have retained at least some degree of control over the manner in which the work is done*. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations*. Such a general right is usually reserved to employers, *but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.*"

Kamla, 147 Wn.2d at 121 (emphasis added) (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)).

Notably, when the principal "retains control over some part of the work," the principal "has a duty, *within the scope of that control*, to provide a safe place of work." Kelley, 90 Wn.2d at 330 (emphasis added).

B

Farias raises various arguments regarding why a genuine issue of material fact exists as to whether Port Blakely owed a common law duty to Ruben to provide a safe workplace. First, Farias asserts that Port Blakely retained sufficient control over the manner in which BLI performed its work pursuant to both the contract between Port Blakely and BLI and Port Blakely's best management practices manual. In particular, the contract between Port Blakely and BLI provided:

18

No. 82789-8-I/19

Logger shall conform to the following objectives and requirements in conducting its operations under this Contract:

. . .

e. Log the Timber with only equipment which is sized appropriately to the conditions of the Land and Timber *and by the method as may be indicated in the Port Blakely Best Management Practices*.

(Emphasis added.)

According to Farias, the following section from Port Blakely's best management practices manual raises a genuine issue of material fact with regard to whether Port Blakely retained sufficient control:

**5.     Timber Felling**
Timber felling is an important factor in the harvest efficiency and value recovery in a harvest operation.  The following Best Management Practices will greatly assist in maximizing timber value and harvest efficiency.
**5.1     Stumps**
Stumps should be less than 12" in height.  Higher stumps are acceptable for safety reasons and on steep slopes to help hold timber on the sidehill.  As the size of the timber dictates, "sniping" of stumps is encouraged to minimize breakage.
**5.2     Directional felling**
Timber generally should be felled parallel to the general topography of the ground.  Crossing lead should be avoided except where required for safety reasons or adjacent to streams and buffers where keeping felled timber out of these areas is required.  Occasionally, harvest methods may require the timber to be "quartered" up the hill to assist the removal of timber and is acceptable.
**5.3.    Hand and mechanical felling on tree length yarding operations**
Generally, when implementing tree length yarding operations timber should be fell with the butt of the log facing the landing.  When using tree length cable yarding operations, felling trees directly downhill (perpendicular) is sometimes necessary; contractor should notify Port Blakely prior to this type of felling pattern.

19

This section of Port Blakely's best management practices manual indicates that Port Blakely retained some control over the manner in which timber was felled. However, this section does not indicate that Port Blakely failed to maintain a safe workplace *within the scope* of that control. Ruben did not die as a result of felling timber.[10] Rather, Ruben died while he was "bucking," or cutting into sections, trees that had already been felled. Because Ruben did not die as a result of felling timber, the control retained by Port Blakely pursuant to this section of its best management practices manual is insufficient to establish a genuine issue of material fact as to whether Port Blakely failed to provide a safe workplace within the scope of its control.

We also note that the best management practices manual contains this section regarding bucking:

> Contractor will buck logs to Port Blakely specifications. Port Blakely will supply information regarding quality, acceptable defects, lengths and diameter specification that maximize the value of the logs produced. All logs should be manufactured to desired customer specifications. Limbs must be trimmed flush to the log. Contractor is expected to accurately measure all logs. Mechanical processing equipment measurements should be verified periodically throughout the day. All methods used to buck the log will minimize mechanical damage.

This section does not indicate that Port Blakely retained control over *the manner* in which BLI chose to perform this work. Indeed, this section does not dictate *the manner* in which BLI employees should buck logs in order to conform with any "information regarding quality, acceptable defects, lengths and diameter specification that maximize the value of the logs produced." Likewise, this

---

[10] "Fell" is defined as "[t]o cut down trees." WAC 296-54-505. Similarly, "[f]eller" is defined as "[a]n employee who fells trees." WAC 296-54-505.

20

No. 82789-8-I/21

section does not dictate *the manner* in which BLI employees should "manufacture[]" logs to meet "desired customer specifications." This section also does not dictate *the manner* in which "[l]imbs must be trimmed" so that they are "flush to the log."[11] Furthermore, this section does not dictate *the manner* in which BLI employees should "accurately measure all logs" and "verif[y]" the "[m]echanical processing equipment measurements . . . throughout the day." Finally, this section does not dictate what particular "methods" should be "used to buck the log" in order to "minimize mechanical damage." Instead, this section, at most, broadly requires any particular method that is adopted by BLI to also "minimize mechanical damage." Thus, this section is of no aid to Farias.

Next, Farias cites to a separate section from Port Blakely's best management practices manual. This section, which is entitled "Spill Contingency Plan," provides various requirements regarding the handling of "herbicides, petroleum products, such as hydraulic fluid, diesel or gas, or other regulated materials." (Bold face omitted.) This section also provides reporting requirements regarding the spillage of regulated materials. Ruben did not die as a result of handling or reporting regulated materials. Accordingly, the control exercised by Port Blakely pursuant to this section of its best management practices manual is insufficient to establish a genuine issue of material fact as to whether Port Blakely failed to provide a safe workplace within the scope of its control.

---

[11] In any event, there is no indication in the record that Ruben died as a result of trimming limbs on any log.

21

Farias also cites to a document entitled "Pre-Operation Meeting Checklist." Farias asserts that this checklist is significant because it "includes sections for [Port Blakely] to dictate 'Logging Method,' 'Cutting Method,' and 'Equipment Restrictions.'"[12] The relevant portion of this checklist appears as follows:

| Equipment Restrictions | Yes | No |
|---|---|---|
| | Explain | _____ |
| Logging Method | SHOVEL CABLE OTHER | |
| Cutting Method | HAND FELL BUNCHER | |

Farias fails to explain how, exactly, this checklist indicates that Port Blakely retained control over the manner in which BLI performed its work. In particular, Farias does not explain what the terms "shovel cable other" or "hand fell buncher" mean. Farias also does not explain how this document indicates that Port Blakely failed to provide a safe workplace within the scope of any control that this checklist suggests that Port Blakely retained.

Additionally, Farias cites to a document entitled "Developing a Safety First Culture." This document provides that Port Blakely "identified four initiatives [it was] going to begin holding [its contractors] accountable towards." These safety initiatives require Port Blakely's contractors to (1) "be participants in the [Washington State Loggers Safety Initiative] program," (2) "develop, promote, and demonstrate a commitment to a culture within their own companies that makes safety its first priority," (3) "address site specific hazards by awareness, communication, & mitigation plans," and (4) report "all incidents that occur on all

---

[12] Br. of Appellant at 60.

No. 82789-8-I/23

operation on company lands." Farias fails to explain how these safety initiatives

raise a fact issue as to whether Port Blakely failed to provide a safe workplace

within the scope of any control retained by Port Blakely pursuant to these safety

initiatives.[13]

Next, Farias cites to a portion of the contract between Port Blakely and

BLI which provided that "Port Blakely grants Logger the non-exclusive right to

use its existing roads and rights-of-way on and to the Land for the purpose of

conducting Logger's operations hereunder." Farias assigns significance to the

following language from the contract:

> Logger's construction of new spur roads, skid roads and landings
> as may be necessary in connection with Logger's operations under
> this Contract shall be permitted subject to the prior mutual
> concurrence of Port Blakely and Logger as to their location, size,
> grade, surfacing, and number, in order to minimize damage and
> protect natural resources and subject to the provisions of the
> Timber Harvest Permit and applicable laws and regulations.

However, this portion of the contract does not indicate that Port Blakely

retained control over the *manner* in which BLI performed its work. In any event,

this portion of the contract merely concerns the construction of any roads located

within the project site. Ruben did not die as the result of participating in the

construction of any roads on the project site. Neither did he die as the result of

substandard road construction performed by others. Therefore, Farias does not

---

[13] Relatedly, Farias cites to a document entitled "PORT BLAKELY TREE FARMS, L.P. CONTRACTOR SAFETY STANDARDS." (Bold face omitted.) This document details the same four safety initiatives that are contained within the document entitled "Developing a Safety First Culture." Nothing else in the document regarding contractor safety standards indicates that Port Blakely controlled the manner in which BLI performed its work. Thus, this document does not indicate that Port Blakely failed to provide a safe workplace within the scope of any control retained by Port Blakely.

23

No. 82789-8-I/24

demonstrate that Port Blakely failed to provide a safe workplace within the scope of any control retained by Port Blakely pursuant to this section of the contract.

Farias also cites to the following deposition testimony of a Port Blakely employee:

Q    I've heard of the concept, in preparing a logging site, of a layout engineer.
Is that something involved in the preparation of a site for Port Blakely?

A    Yeah, that's the process . . . where you're, you know, flagging all the buffers and identifying the critical sites, and when I say "flagging," you are actually walking through the woods and hanging ribbon around that stuff so that when the contractor comes in to do the harvest, they know where the boundaries are, you know.

. . . .

Q    Does the layout engineer also identify locations like landings or hauling areas that are going to be on the logging site?

A    Yes -- yep.

According to Farias, this deposition testimony raises a fact issue as to whether Port Blakely retained sufficient control over the jobsite because "[l]anding locations—like the one where Ruben died—were pre-determined by Port Blakely's 'layout engineer.'"[14]  However, this deposition testimony does not indicate that Port Blakely retained any control over the manner in which BLI performed its work.  Instead, this testimony provides that a Port Blakely employee "flagged" various areas of the jobsite before any contractors engaged in work at the jobsite.  Therefore, this testimony does not raise a genuine issue of material fact as to whether Port Blakely owed a common law duty to provide a safe workplace.

_____

[14] Br. of Appellant at 61.

24

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Farias also cites to a declaration of an individual who worked at the jobsite at which Ruben died. This declaration provides, in pertinent part:

> A large timber company called Port Blakely Tree Farms hired [BLI]. Port Blakely was in charge of the jobsite. Both [BLI] and Port Blakely ran safety meetings and trainings on site. Brad Lyons was the boss of [BLI], and Jerry Bailey was the boss of Port Blakely. It was clear that Port Blakeley [sic] was in charge of the jobsite and safety meetings/trainings and that Mr. Lyons answered to Mr. Bailey on site.

Notwithstanding Farias's urging to the contrary, there are at least two reasons why this declaration does not raise a genuine issue of material fact as to whether Port Blakely retained a sufficient amount of control so as to owe Ruben a common law duty to provide a safe workplace. First, the statement that "Port Blakely was in charge of the jobsite" is merely conclusory. "Affidavits containing conclusory statements without adequate factual support are insufficient to defeat a motion for summary judgment." Guile v. Ballard Cmty. Hosp., 70 Wn. App. 18, 25, 851 P.2d 689 (1993) (citing CR 56(e)). The record is devoid of evidence that the declarant was sufficiently familiar with the legal or contractual relationships at issue to make such an averment based on personal knowledge. See ER 602.

Second, the fact that Port Blakely "ran safety meetings and trainings on site" does not indicate that Port Blakely engaged in safety trainings specifically dealing with bucking—the activity that Ruben was engaging in when he died. As such, Port Blakely's engagement in these safety meetings and trainings does not raise a fact issue as to whether Port Blakely failed to provide a safe workplace within the scope of any control exercised through its engagement in these safety

25

meetings and trainings. Thus, the existence of this declaration does not support Farias's claim of trial court error.

Next, Farias quotes a section of the contract between Port Blakely and BLI, which provides: "If any subcontractor takes any action . . . inconsistent with this Contract . . . , the same shall constitute a default by the Logger under this Contract, and Logger shall . . . promptly terminate any such subcontractor at Port Blakely's request." However, this contract language does not indicate that Port Blakely retained any control over the manner in which BLI performed its work. To the contrary, this language merely requires BLI to terminate any subcontractor at Port Blakely's request if the subcontractor acts inconsistently with the contract between Port Blakely and BLI.

Farias also quotes another section of the contract between Port Blakely and BLI, which states:

> If any condition or circumstance arises which entitles Port Blakely to terminate this Contract For Cause or For Impracticability, then in addition to the right of termination, Port Blakely shall also have the right, at its option, to notify Logger to immediately suspend its operation hereunder (without terminating this Contract) until Logger has cured any such default and/or any such condition or circumstance rendering operations impracticable or impossible to perform have improved to Port Blakely's satisfaction.

Again, this language does not indicate that Port Blakely retained the right to control *the manner* in which BLI performed its work. See Kamla, 147 Wn.2d at 121 ("'It is not enough that [the employer] has merely a general right to order the work stopped or resumed.'" (quoting RESTATEMENT § 414 cmt. c)).

Farias additionally quotes another section of the contract, which provides: "If Port Blakely determines in good faith that . . . weather conditions . . . are

26

No. 82789-8-I/27

creating an excessive . . . risk of injury to persons . . . , Port Blakely may by notice to Logger require Logger to temporarily suspend operations hereunder." Farias cites to Kinney v. Space Needle Corp., 121 Wn. App. 242, 85 P.3d 918 (2004), in support of its argument that the quoted contract language raises a fact issue as to whether Port Blakely retained sufficient control to provide a safe workplace. In Kinney, we held that a genuine issue of material fact existed as to whether a jobsite owner owed a common law duty of care to an employee of a contractor where the jobsite owner "retained the right to stop [the contractor's] employees from working, especially when bad weather conditions occurred." 121 Wn. App. at 245. In that case, however, the contractor's employee sustained injuries from falling after "[i]t began to rain but [the employee] continued to work on the exposed roof." Kinney, 121 Wn. App. at 246. Specifically, the employee therein "lost her footing" as she was ascending a ladder and "[t]he small glossy rungs of the upper ladder were wet from the rain." Kinney, 121 Wn. App. at 246. Such was not the case herein. Ruben was not injured as a result of bad weather conditions. Accordingly, the contract language upon which Farias relies does not raise a fact issue as to whether Port Blakely failed to provide a safe workplace within the scope of any control retained by Port Blakely.

Farias next asserts that a fact issue exists as to Port Blakely's retained control because the contract between Port Blakely and BLI "allows Port Blakely to essentially garnish funds earned by BLI in order to pay industrial insurance

27

No. 82789-8-I/28

premiums for BLI employees."[15]  However, even assuming that the contract authorized Port Blakely to do so, such a contract provision does not indicate that Port Blakely retained any control over the manner in which BLI performed its work.

Farias next contends that a fact issue exists as to Port Blakely's retained control because of "the sheer magnitude of BLI's economic dependence on Port Blakely."[16]  For example, in a deposition, an owner of BLI testified that BLI received "[e]ighty percent or better" of its work from Port Blakely.  Once again, however, the amount of work that BLI performed for Port Blakely does not indicate that Port Blakely controlled the manner in which BLI performed its work.

Farias additionally contends that a fact issue exists as to Port Blakely's retained control because Port Blakely contracted with "at least six different companies on the Lost Mower jobsite" during "the month Ruben died" and because BLI had no contractual authority over Port Blakely's employees or the employees of its contractors.[17]  In support of this argument, Farias quotes language from Afoa I:

> The Port [of Seattle] is the only entity with sufficient supervisory and coordinating authority to ensure safety in this complex, multiemployer work site.  If the Port does not keep Sea-Tac Airport safe for workers, it is difficult to imagine who will.  The Port cannot absolve itself of its responsibility under the law simply by declining to "hire" contractors and instead issuing them licenses.

176 Wn.2d at 479.

---

[15] Br. of Appellant at 64.
[16] Br. of Appellant at 65.
[17] Br. of Appellant at 64.

28

In Afoa I, however, the Port of Seattle retained substantially more control over the workplace than did Port Blakely. Indeed, in Afoa I, our Supreme Court explained that "[w]here there are multiple employers performing a variety of tasks in a complex working environment, it is essential that a safe workplace duty be placed on a landlord *who retains the right to control the movements of all workers on the site to ensure safety.*" 176 Wn.2d at 479 (emphasis added). Unlike the situation in Afoa I, Farias has not established that Port Blakely retained the right to control the movements of all workers on the jobsite. Furthermore, in Afoa I, a fact issue existed as to whether the area in which the injury occurred was "'subject at all times to the *exclusive* control and management by the Port [of Seattle].'" 176 Wn.2d at 482 (emphasis added). Farias does not raise a fact issue as to whether the area in which Ruben died was under Port Blakely's *exclusive* control and management. Additionally, a fact issue existed in Afoa I as to whether the Port of Seattle "continuously control[ed] *the actions* of [the plaintiff's employer] and its employees" and as to whether these employees were "subject a*t all times* to the Port's *pervasive and overriding* supervision and control." Afoa I, 176 Wn.2d at 482 (emphasis added). Farias has not established a fact issue as to whether Port Blakely either retained or exercised any similar level of control. Accordingly, Afoa I is of no aid to Farias.

Because Farias fails to establish a genuine issue of material fact as to whether Port Blakely failed to provide a safe workplace within the scope of any control that was retained by Port Blakely, Port Blakely did not owe Ruben a

29

No. 82789-8-I/30

common law duty to provide a safe workplace. Accordingly, the trial court did not err by dismissing this claim on summary judgment.

V

Finally, Farias contends that the trial court erred by ruling that Port Blakely did not owe a specific duty to comply with the rules, regulations, and orders promulgated under WISHA. We disagree. Farias does not assert that any particular WISHA rule, regulation, or order was violated in relation to Ruben's death. For this reason alone, the trial court properly granted Port Blakely's motion for summary judgment.[18] See Kamla, 147 Wn.2d at 125.

In any event, Farias does not raise a genuine issue of material fact as to whether Port Blakely retained sufficient control over the manner in which BLI

---

[18] We note that WAC 296-54-513 imposes certain requirements regarding the frequency in which employees must have contact with other employees who are engaged in bucking:

> (3) Each employee must be within visual, audible, or radio/telephone contact with another person who can assist in case of emergency.
> (4) In any logging operation where cutting, yarding, or loading are performed, there must be at least two employees working as a team.
> (5) Each employee must have visual or audible signal contact with another employee as often as this schedule requires:
> (a) Cutters – 30 minutes.

"Cutter" is defined as "[a]n employee whose primary job is to fall, buck, or limb trees before they are moved to the landing area." WAC 296-54-505.

The record does not indicate that this regulation was violated. Indeed, according to the deposition testimony of Bryce Lyons, 20 to 30 minutes had passed from the time Bryce instructed Ruben to buck logs until the time that Bryce discovered Ruben's body:

> Q  . . . Understanding now, you were really the last person who saw Ruben alive. Is that fair?
> A  Yeah.
> Q  And that's when you told him that Russ had stacked up some logs that he could work on?
> A  Yeah.
> Q  You were asked about how long it had been since you'd seen him, and you said 20 or 30 minutes. What were you basing that on?
> A  From the time I told him to go, from where I saw him.

Therefore, on this record, WAC 296-54-513 was not violated.

30

performed its work in order to owe a specific duty to comply with WISHA regulations.

"[J]obsite owners have a duty to comply with WISHA only if they retain control over the manner in which contractors complete their work." Afoa I, 176 Wn.2d at 472 (citing Kamla, 147 Wn.2d at 125).

Here, Port Blakey contracted with BLI to, among other things, "cut, fall, [and] buck . . . the Timber." As already explained, Port Blakely's best management practices manual, at most, arguably indicates that Port Blakely retained some control over the manner in which timber was felled. However, the record contains no indication that any BLI employee engaged in timber felling. To the contrary, BLI engaged in a "[v]erbal agreement/handshake deal" with MVR Timber Cutting pursuant to which one employee of MVR Timber Cutting operated a "feller buncher." According to the deposition testimony of an owner of BLI, a feller buncher is "kind of like an excavator with a boom, and it has a circular saw that cuts the tree down and then they can lay them down." This deposition testimony also indicates that only the employee of MVR Timber Cutting—and not any employee of BLI—operated the feller buncher:

A     There was a feller buncher working too.
Q     And what's a feller buncher?
A     They cut down the trees.
Q     Do you know -- was that a Buck's --
A     No. That was an M[V]R.
. . . .
Q     Who from MVR was running the feller buncher?
A     I think his name was Brad.

On this record, there are two reasons why Port Blakely did not owe a specific duty under WISHA to Ruben. First, and as already explained, there is no

No. 82789-8-I/32

indication in the record that Ruben died while he or anyone else was felling timber. Therefore, any control retained by Port Blakely over the manner in which timber was felled does not support Farias's claim under WISHA. Second, there is no indication in the record that any BLI employee operated the feller buncher or otherwise felled trees on the jobsite. Instead, the record indicates that only an employee of MVR Timber Cutting engaged in timber felling. Accordingly, Farias fails to establish a fact issue as to whether Port Blakely retained control over the manner in which *BLI* performed its work. In turn, Port Blakely did not owe a duty to BLI's employees to comply with the rules, regulations, and orders promulgated under WISHA.

Accordingly, the trial court did not err by granting Port Blakely's motion for summary judgment.

Affirmed.

Dwyer, J.

WE CONCUR:

Bowman, J.        Andrus, C.J.

32